```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF CALIFORNIA
 2                BEFORE THE HONORABLE TROY L. NUNLEY, JUDGE

 3                            ---o0o---

 4
      UNITED STATES OF AMERICA,
 5
             Plaintiff,
 6
      Vs.                                  CASE NO. 2:11-CR-537 TLN
 7
      TROY STRATOS,
 8
             Defendant.
 9    _____/

10

11                      REPORTER'S TRANSCRIPT
              RE:   EXCERPT - TRIAL TESTIMONY OF DIVESH MAKAN
12                  FRIDAY, MAY 8TH, 2015, 9:00 A.M.

13

14    APPEARANCES:

15    For the Government:        OFFICE OF THE UNITED STATES ATTORNEY
                                 501 I Street, Suite 10-100
16                               Sacramento, California  95814
                                 BY:  TODD PICKLES, AUSA,
17                               BY:  JARED DOLAN, AUSA

18    For the Defendant:        OFFICE OF THE FEDERAL DEFENDER
                                 801 I Streeet, 3rd Floor
19                               Sacramento, California  95814
                                 BY:  HEATHER WILLIAMS, FEDERAL PD
20                               BY:  NOA OREN, FEDERAL PD
                                 BY:  TIMOTHY ZINDEL, FEDERAL PD
21

22

23    Reported by:  CATHERINE E.F. BODENE, CSR #6926, RPR
                     Official Court Reporter USDC, 916-446-6360
24                   501 I Street, Room 4-200
                     Sacramento, California  95814
25
      TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

1                          <u>EXAMINATION INDEX</u>

2                             ---o0o---

3    <u>FOR THE GOVERNMENT</u>:

4        <u>EXAMINATION</u>:                                    <u>PAGE</u>

5      DIVESH MAKAN

6        Direct Examination by Mr. Dolan              4
         Cross-Examination by Ms. Williams            8
7

8

9

10

11

12

13

14                            ---o0o---

15

16

17

18

19

20

21

22

23

24

25

1     SACRAMENTO, CALIFORNIA, FRIDAY, MAY 8TH, 2015, 9:00 A.M.

2                              ---o0o---

3      (Trial excerpt.  Trial testimony of Divesh Makan.)

4           THE CLERK:  All rise.  Court is now in session.

5      The Honorable Troy L. Nunley, United States District Court

6   Judge, presiding.

7      Thank you.  You may be seated.

8           THE COURT:  Good morning, Ladies and Gentlemen.

9           THE CLERK:  Calling Criminal Case 11-CR-537, United

10  States versus Troy Stratos.  On for jury trial.

11          THE COURT:  Thank you.  Good morning, Counsel.

12     All right.  Ladies and Gentlemen, this morning we were

13  intending to resume with the witness Tim Burns.  However, I

14  have been told we're going to take some witnesses out of order.

15     Is that correct?

16          MR. PICKLES:  Yes, Your Honor.

17          THE COURT:  All right.  The motion is granted.

18     Call your next witness, please.

19          MR. DOLAN:  Your Honor, the United States calls Divesh

20  Makan.

21          THE CLERK:  Stand right here.  Thank you.  Please,

22  raise your right hand.

23                          DIVESH MAKAN,

24  was thereupon called as a witness, and having been sworn to

25  tell the truth, the whole truth and nothing but the truth, was

1    thereupon examined and testified as follows:

2            THE CLERK:  Thank you.  Please, have a seat.

3        Please, state and spell your first and last name for the

4    record.

5            THE WITNESS:  My name is Divesh Makan, D-i-v-e-s-h,

6    last name, M-a-k-a-n.

7            THE CLERK:  Thank you.

8            THE COURT:  All right.  Counsel, proceed.

9                        <u>DIRECT EXAMINATION</u>

10   BY MR. DOLAN:

11   Q.  Sir, where do you reside, city and state?

12   A.  San Francisco, California.

13   Q.  What do you for a living?

14   A.  I am an investment advisor.

15   Q.  Where do you -- where are you an investment advisor?

16   A.  I work at a firm called Iconiq Capital.

17   Q.  What's the nature of that firm?

18   A.  The firm advises families how to invest their capital.

19   Q.  And what is your role at that firm?

20   A.  I'm an advisor at the firm.

21   Q.  Okay.  How long have you been in that role?

22   A.  I've been -- the firm is three years old, and I've been at

23   the firm for three years.

24   Q.  Where were you before then?

25   A.  I was at a firm called Morgan Stanley.

1    Q.  What was your role there?

2    A.  Same thing, investment advisor.

3    Q.  Do you have a connection to Facebook?

4    A.  I do.

5    Q.  What's the nature of that connection?

6    A.  We advise a few families that work or have worked at

7    Facebook for their financial matters.

8    Q.  And do those families include people that are pretty high

9    up in the organization?

10   A.  They do.

11   Q.  Including many of the founders?

12   A.  Yes.  Some of the founders.

13   Q.  Are you familiar with the name Ken Dennis?

14   A.  I am.

15   Q.  How are you familiar with that name?

16   A.  I had received a couple of phone calls many years ago from

17   a person by the name of Ken Dennis.

18   Q.  What were the nature of the phone calls?

19   A.  I received one phone call where Ken Dennis had claimed to

20   be Carlos Slim's person, his advisor, and he wanted to acquire

21   Facebook shares.

22   Q.  Did you have an understanding who Carlos Slim was?

23   A.  I did by reputation.

24   Q.  Who is he or was he?

25   A.  Carlos Slim is one of the wealthiest men in the world, who

1   owns one of the largest telecommunication companies.  I think

2   the second wealthiest man in the world.  Very powerful investor

3   and controller of emerging markets.

4   Q.  What was the nature of the second phone call?

5   A.  The second phone -- so the first call he just abruptly hung

6   up after maybe a minute.  The second phone call, he called back

7   and said that the project he was working on is not concluded,

8   and he would like to acquire Facebook shares on behalf of

9   Carlos Slim, and if I could introduce him to someone who could

10  make something like that happen.

11  Q.  Were you willing to do that?

12  A.  I was happy to speak to the CFO at the company.

13  Q.  Why?

14  A.  I knew the CFO.  Carlos Slim was a strategically important

15  family in the world to a company like Facebook, especially as I

16  was thinking of potentially emerging markets.  It seemed like a

17  reasonable request.

18         MR. DOLAN:  Permission to publish 9a-12, previously

19  admitted?

20         THE COURT:  Yes.

21     (Exhibit published.)

22  BY MR. DOLAN:

23  Q.  Sir, do you recognize what is on the screen in front of

24  you?

25  A.  I do.

1    Q.  How do you recognize it?

2    A.  I wrote the email.

3    Q.  And who is David Ebersman?

4    A.  David Ebersman was the CFO at Facebook at the time.

5    Q.  And who is wpacquisitions?

6    A.  It was Ken Dennis's email address that he had provided.

7    Q.  Did you have any role after this introduction was made?

8    A.  No, I didn't.

9    Q.  Do you remember how you met Mr. Dennis?

10   A.  I believe, to the best of my recollection, that it was an

11   introduction from a guy by the name of Joe Schnaier.

12   Q.  Do you remember the nature of the introduction?

13   A.  No, I don't, beyond him calling me and telling me that

14   Carlos Slim's person wanted to speak to me about some Facebook

15   share activity.

16   Q.  Have you ever met Mr. Dennis?

17   A.  No.

18   Q.  Are you familiar, separate from these proceedings, with the

19   name Troy Stratos?

20   A.  No.

21   Q.  Have you ever heard of Soumaya Securities?

22   A.  No.

23          MR. DOLAN:  One moment, Your Honor.

24      (Government counsel confer.)

25      Nothing further.

1          THE WITNESS:  Thank you.

2          MR. DOLAN:  Not yet.

3          THE COURT:  All right.  Miss Williams.

4          MS. WILLIAMS:  Thank you.

5                    CROSS-EXAMINATION

6    BY MS. WILLIAMS:

7    Q.  Good morning.

8    A.  Good morning.

9    Q.  You indicated you're an investment advisor?

10   A.  I am.

11   Q.  And to be an investment advisor involving stock, do you

12   have to be licensed or registered with the SEC?

13   A.  You do.

14   Q.  And you are?

15   A.  I am.

16   Q.  In order to do that, you had to pass SEC licensing

17   examinations?

18   A.  Correct.

19   Q.  One of those examinations you passed was the General

20   Securities Representative Examination?

21   A.  I believe so.

22   Q.  One of those was the National Commodities Futures

23   Examination?

24   A.  I believe so.

25   Q.  And the other was I think what everybody has to take, and

1   that's the Uniform State Law Examination?

2   A.   I believe you.

3   Q.   And once you passed those, that allowed you to go ahead and

4   represent clients and advise clients the way you have

5   described?

6   A.   That's right.

7   Q.   Is it fair to say that providing the financial management

8   services that you do and Iconiq does is a team effort?

9   A.   Yes.

10  Q.   It involves including occasionally other individuals with

11  other skills, such as accounting or tax skills?

12  A.   Yes.

13  Q.   Maybe I didn't phrase it well.

14  A.   People hire accountants.  People hire tax firms and legal

15  firms.  We don't provide that information or that advice.

16  Q.   And you have worked up a system so that when somebody has

17  approached you to perhaps seek Facebook shares, you will make

18  referrals to other people of that team that you're involved

19  with?

20  A.   No.  We don't have a team.  Our team is internal to Iconiq

21  or the firm I'm working with.

22  Q.   I think I'm using the wrong terminology then.

23       For instance, you might go ahead and refer someone to

24  Mr. van Loben Sels?

25       Do you know Tom van Loben Sels?

1    A.  I do.

2    Q.  How do you know him?

3    A.  He's the accountant to some of the families we represent.

4    Q.  And does he provide tax services and advice?

5    A.  He does.

6    Q.  Also you might refer them to Peter Healy?

7    A.  Correct.  He's a lawyer.

8    Q.  And he's the one who handles the legal side, the paperwork,

9    the contracts and any kind of a share sale?

10   A.  In all legal matters.  He does lots of different legal

11   work.

12   Q.  Very good.

13       Now, you said that you represent some of the Facebook

14   founders and some shareholders; is that correct?

15   A.  Correct.

16   Q.  Former employees and present employees?

17   A.  Correct.

18   Q.  And that's common knowledge, that you represent those

19   individuals?

20   A.  Is that a question?

21   Q.  Yes.

22   A.  Yes, I guess.

23   Q.  That information is on the Internet?

24   A.  Sure.

25   Q.  There have been some articles about you?

1    A.   Sure.

2    Q.   And you're known in the wealth advisement industry for what

3    you do for those individuals?

4    A.   I guess.

5    Q.   Do you regularly get calls from people who may be offering

6    to buy a significant number of shares of Facebook stock?

7    A.   Occasionally.

8    Q.   I think that when you talked -- well, did you talk to the

9    FBI related to this case?

10   A.   Yes.  Many years ago.

11   Q.   If I'm asking a question where it might help to look at the

12   report to help you remember what you might have said, just let

13   me know.

14   A.   Thank you.

15   Q.   Do you remember telling the FBI agent that you might get

16   maybe five to eight calls a month?

17   A.   That sounds right.

18   Q.   And when you get those calls, you want to put the

19   individual or the entity through a vetting process?

20   A.   I don't remember that, but...

21          MS. WILLIAMS:  If I can have just a minute, Your

22   Honor.

23          THE COURT:  Yes, you may.

24      (Defense counsel confer.)

25          MS. WILLIAMS:  May I approach the witness, Your Honor?

```
 1              THE COURT:  Yes, you may.

 2              MS. WILLIAMS:  I'm approaching with what's been marked

 3       as Exhibit AK.

 4              THE COURT:  By the way, the last response the witness

 5       said "I don't remember."  Are you attempting to refresh his

 6       memory with something?

 7              MS. WILLIAMS:  I am.

 8              THE COURT:  All right.

 9         (Exhibit handed to witness for review.)

10              THE WITNESS:  Thank you.

11       BY MS. WILLIAMS:

12       Q.  Before coming here today, had you been given a chance to

13       review the report the FBI wrote of their interview with you?

14       A.  No.

15       Q.  In looking at Exhibit AK, just glance at the first page

16       maybe to orient yourself, please.

17       A.  (Witness reviews exhibit.)

18       Q.  I see that you are looking beyond page 1.

19       A.  Sorry.

20       Q.  No.  That's fine.  But having looked so far, does it look

21       like that is a summary of the interview you had?

22       A.  Yeah.  I think so.  This looks right.

23       Q.  So the question I asked you was whether or not, when you

24       get those five to eight calls per month of people offering a

25       significant investment in Facebook, you have a vetting process?
```

1    A.   I don't have a vetting process.  When I get those phone

2    calls, I send them off to Tom or Peter Healy or the company.

3    It's more forwarding the information of the person to the

4    correct party.

5    Q.   So that they will go ahead and vet?

6    A.   I assume they vet, but I haven't been part of it so I don't

7    know exactly what they do.

8    Q.   You make a referral.  You don't handle it yourself?

9    A.   Yeah.  I send it out, correct.

10   Q.   As you said, that would be sending the person to either

11   Mr. van Loben Sels or Mr. Healy so they can go ahead and follow

12   through?

13   A.   Or the company.

14   Q.   Facebook?

15   A.   Or Facebook, correct.

16   Q.   I would like to take you back to 2010.  Okay.

17        At that time you worked for Morgan Stanley?

18   A.   I did.

19   Q.   And these Facebook employees and former employees, they

20   were your clients at that time as well?

21   A.   Some of them were.

22   Q.   You had mentioned the name Joe Schnaier.  Had somebody

23   recommended that you contact Joe Schnaier, who was in New York

24   City, when you might have been there?

25   A.   Yes.  A guy by the name of Gurpreet.  I don't remember his

1    last name.

2    Q.  This wasn't somebody you actually knew?

3    A.  He was a fellow Wharton colleague.  We went to the same

4    business school.  But I didn't know him until maybe a year

5    before that.

6    Q.  It was he who made the recommendation to contact Joe

7    Schnaier?

8    A.  I believe that's the case.

9    Q.  You were in New York City, so you thought, well, I might be

10   able to spare about 15 minutes?

11   A.  That's it.  Yes.

12   Q.  And you actually meet with Mr. Schnaier?

13   A.  I did.

14   Q.  When you met with Mr. Schnaier, he seemed well presented?

15   A.  Yes.

16   Q.  Had a fancy watch on?

17   A.  Yes.

18   Q.  And he made certain claims to you?

19   A.  Correct.

20   Q.  He claimed that he worked for a mid-eastern family?

21        MR. DOLAN:  Objection.  Hearsay.

22        THE COURT:  Sustained.

23        MS. WILLIAMS:  It is not for the truth of what was

24   said, but something was said, some representations were made.

25        THE COURT:  All right.  So you --

1      MR. DOLAN:  Objection.  Relevance.

2      THE COURT:  Just a moment.  So my understanding is

3  that your offer of proof is that you're offering it to show

4  what this witness's state of mind was to show this witness did

5  something based on the information he received?

6      MS. WILLIAMS:  That's correct.

7      THE COURT:  I'm going to allow it for the limited

8  purpose of showing what the witness's state of mind is subject

9  to him doing something based upon the receipt of that

10  information.

11      However, Ladies and Gentlemen, this information is not

12  being offered for the truth of the matter asserted.  In other

13  words, it is not being offered to show the information is

14  actually true.  It is just being offered to show what, if

15  anything, this witness, Mr. Makan, did after receiving that

16  information.

17      All right.  Proceed.

18  BY MS. WILLIAMS:

19  Q.  He claimed that it was a wealthy mid-eastern family?

20  A.  You know, if I read this report, and that's what it says,

21  then that's what I said.

22      I don't remember what I said.  That's a long time ago.  If

23  I read it out, it says exactly that.

24  Q.  Does that help you, then, to remember what you might have

25  said?

1    A.   No.

2    Q.   Okay.

3    A.   But I believe they wrote it down correctly, so...

4    Q.   Do you remember him making other claims in that meeting?

5    For instance, about owning a software company?

6    A.   He may have.  I don't remember.  It's a long time ago.

7    Q.   It was a brief meeting?

8    A.   It literally was a brief meeting.

9    Q.   And you meet lots of people?

10   A.   I meet a fair amount of people, correct.

11        But I do believe they have written it down correctly, so --

12   I have no reason to doubt it.

13   Q.   Okay.  And he said that he was looking for Facebook shares

14   as an investment?

15        MR. DOLAN:  Objection.  Foundation.  Based on the

16   witness's testimony.

17        THE COURT:  The objection is overruled because your

18   question is asking whether or not this is something Joe

19   Schnaier told him, correct?

20        MS. WILLIAMS:  Correct.

21        THE COURT:  All right.  And once again, Ladies and

22   Gentlemen, this information is not being received for the truth

23   of the matter asserted.  It is just being used to show what, if

24   anything, this witness did after receipt of the information.

25        I'm going to overrule the objection.

1    BY MS. WILLIAMS:

2    Q.  He said that he was looking for Facebook shares as an

3    investment?

4    A.  I don't know whether he told me that in the meeting.  I

5    don't remember.

6    Q.  Okay.  But it's in the report, and -- but you don't have

7    any independent recollection?

8            MR. DOLAN:  Objection.  Hearsay.

9            THE COURT:  The objection is sustained.  And I'm also

10   going to sustain an objection on the court's own motion as to

11   testifying into the record.

12       You can show the witness the statement and see if it

13   refreshes his memory as to what, if anything, Joe Schnaier may

14   have told him, but once the witness says that after reviewing

15   the statement he still doesn't remember, then you're stuck with

16   that response.  You can't go ahead and read it into the record.

17       Let's go ahead and proceed.

18           MS. WILLIAMS:  Thank you.  If I can just make a note,

19   please?

20           THE COURT:  Yes.

21       (Brief pause.)

22   BY MS. WILLIAMS:

23   Q.  Earlier you talked about the procedure where somebody would

24   express an interest in Facebook shares you would go ahead and

25   give them the names of either Mr. van Loben Sels or Mr. Healy?

1   A.  Or the company.

2   Q.  And do you have any recollection of doing that with

3   Mr. Schnaier as well?

4   A.  I believe so.

5   Q.  After that meeting, did you form an opinion about whether

6   or not you thought Joe Schnaier was a truthful and honest

7   person?

8           MR. DOLAN:  Objection.  Relevance.

9           THE COURT:  Sustained.

10  BY MS. WILLIAMS:

11  Q.  Was there another time when Mr. Schnaier contacted you

12  after that in-person meeting?

13  A.  Yes.  He did contact me after that.

14  Q.  And I think you said that he had made the referral -- back

15  up.  This is something different.

16      Do you remember whether or not Mr. Schnaier ever contacted

17  you about other buyers for Facebook, such as the Morris

18  Financial Group?

19  A.  Yes, he did.

20  Q.  Do you remember when that might have been?

21  A.  After the meeting, but I don't -- 2012.  That would be a

22  good guess, after that.  It was after the meeting with

23  Schnaier.  I don't know the date.

24  Q.  This was a phone call?

25  A.  It was a phone call.

1   Q.  And is it your understanding that whatever that deal was

2   with the Morris Financial Group, it never got finished?

3   A.  That's my understanding, correct.

4   Q.  Did you make a decision about whether or not the deal ended

5   well or did not end well?

6           MR. DOLAN:  Objection.  Relevance.

7           THE COURT:  Sustained.

8   BY MS. WILLIAMS:

9   Q.  And then I think that you said that there was yet another

10   time when Mr. Schnaier contacted you, and that was with regard

11   to Ken Dennis?

12   A.  Correct.

13   Q.  And he said that Mr. Dennis -- he told you that Mr. Dennis

14   represented Carlos Slim?

15   A.  That's correct.

16   Q.  And that he, Mr. Dennis, wanted to talk about a Facebook

17   investment?

18   A.  Correct.

19   Q.  And you did receive a call from Mr. Dennis you said?

20   A.  Yes.  Two.

21   Q.  Two calls.  Let's talk about the first one.  Okay.

22       The first one, he made representations to you that he was

23   working on a deal for Carlos Slim?

24   A.  Yes.  He was Carlos Slim's guy, and they were in the middle

25   of a real estate transaction.

1    Q.  But there was some information he refused to go ahead and

2    give to you in that call?

3    A.  No, he didn't.  He made two statements and cut off the

4    phone.  The first was who he was, and two, he was really busy

5    with a real estate transaction.  And then he said that he had

6    to go, and that was the end of the phone call.  It wasn't much

7    of a dialogue, more of a monologue.

8    Q.  Did you take any notations as to, for instance, the phone

9    number he called from on that call?

10   A.  No.

11   Q.  No notation about what area code the call was coming from?

12   A.  No.

13   Q.  Is it possible that at the time you talked with the FBI you

14   did have a memory of that?

15   A.  Potentially.

16   Q.  If I could please have you look at Exhibit AK in front of

17   you, and it is the third page.  It says page 3 at the top.  At

18   the bottom it says 1064.

19   A.  Yep.

20   Q.  And if we could have you look at the very first paragraph.

21   A.  (Witness reviews exhibit.)

22       1064?

23   Q.  Yes.

24   A.  Yep.  I see that.

25   Q.  Does that refresh your memory at all --

1    A.   Yes.

2    Q.   -- about whether or not you gave an area code to the FBI

3    agent?

4    A.   It does.

5    Q.   And that was the area code the number came from?

6    A.   That looks correct.

7    Q.   The area code was 408?

8    A.   Correct.

9    Q.   And were you familiar at the time with the part of the

10   country that 408 covered?

11   A.   San Jose somewhere.   Yeah.

12   Q.   Thank you.

13        And you said there was yet another phone call after that

14   with Mr. Dennis?

15   A.   That's right.

16   Q.   It was about four to six weeks after the first call?

17   A.   I believe it says that.

18   Q.   Okay.   Do you have any memory right now about that?

19   A.   No.   I know the phone call happened.   The timing of it, I

20   don't know.

21   Q.   At that time he talked not about real estate, but about a

22   possible Facebook investment?

23   A.   Correct.

24   Q.   He also talked about his desire to explore a mobile

25   technical -- or technological possibility with Facebook?

1    A.  Correct.

2    Q.  And he asked you for an introduction to somebody at

3    Facebook?

4    A.  That's right.

5    Q.  Because he wanted to figure out what the money would be to

6    go ahead and work on such a deal?

7    A.  I don't know the reason.  He didn't -- he wasn't clear, to

8    the best of my recollection, what he wanted.

9    Q.  But he did want a contact at Facebook to pursue those

10   further?

11   A.  Yeah.  To buy -- to buy shares of Facebook.

12   Q.  And he also said he wanted to have some financial

13   information about Facebook?

14       Do you remember him saying that?

15   A.  I don't remember, but --

16   Q.  If I could have you go ahead and look at Exhibit AK in

17   front of you, and if I can direct you towards the second

18   paragraph towards the bottom --

19   A.  Uh-huh.

20   Q.  -- where it says that he wanted an introduction to someone

21   at Facebook with whom he could discuss financial aspects of

22   such a deal.

23   A.  Okay.

24   Q.  Then the sentence after that --

25           MR. DOLAN:  Objection.  Hearsay.

```
1              THE COURT:  Sustained.  You can queue the witness up
2    to read the portion.  Have him read it, and then let's proceed
3    accordingly.  Then ask him whether or not it refreshes his
4    memory.
5        Let's go.
6    BY MS. WILLIAMS:
7    Q.  In the next sentence is there anything about financial
8    information?
9              MR. DOLAN:  Objection.  Hearsay.
10             THE COURT:  Sustained.  You're trying to refresh his
11   memory to see if this document refreshes his memory as to the
12   substance of a conversation that the prosecution -- that the
13   government went over during direct examination.  You're asking
14   him whether or not he remembers the conversation.  Let him read
15   the document and see if it refreshes his memory, and then you
16   can proceed to ask questions.  Don't read it into the record.
17   BY MS. WILLIAMS:
18   Q.  Does it refresh your memory at all?
19   A.  Which line?
20   Q.  If you are looking at the second paragraph, and we're going
21   to count three lines up from the bottom of the paragraph.
22   A.  (Witness reviews exhibit.)
23       Stratos also wanted to --
24       THE COURT:  Listen to this.  This is what I want you to do.
25   Read the document to yourself.
```

1          THE WITNESS:  Okay.

2          THE COURT:  When you are finished, I want you to look

3    up.  Then she's going to start asking questions about it.

4      Okay?

5          THE WITNESS:  Okay.

6          THE COURT:  All right.  Don't say anything while he's

7    reading.

8      Thank you.

9      (Witness reviews exhibit.)

10         THE COURT:  All right.

11   BY MS. WILLIAMS:

12   Q.  Does that help you remember at all what you told the FBI

13   agent about the second call with Mr. Dennis?

14   A.  Yes.

15   Q.  And does it help you to remember whether or not anything

16   was said about financial information?

17   A.  Yes.  It says that they needed financial -- they wanted to

18   talk about the financial information at Facebook.

19   Q.  Thank you.

20      Would that be an unusual request for somebody who might

21   want to invest in Facebook or any other company?

22   A.  At this scale, no.

23   Q.  You said before -- let me back up.

24      You eventually made a referral of Ken Dennis to David

25   Ebersman?

1    A.  Correct.

2    Q.  At the time he was the chief financial officer of Facebook?

3    A.  Correct.

4    Q.  And he would be the person who might go ahead and start

5    some talks about large investments with Facebook?

6    A.  I suspect so, as CFO.

7    Q.  That's why you made the introduction to him?

8    A.  Correct.

9    Q.  And that was the email that we saw in Exhibit 9a-12?

10   A.  Correct.

11   Q.  Now, there were some sales of Facebook stock by your

12   clients during 2011?

13   A.  I believe so.

14   Q.  And that was before Facebook went public?

15   A.  Yes.

16   Q.  In fact, I think there was a very sizeable deal involving

17   the chief executive officer, Mr. Zuckerberg, and a school

18   district in New Jersey?

19   A.  Yes.

20   Q.  And that one involved $100,000,000?

21   A.  To the best of my memory, yes.

22   Q.  Do you have any idea what the value per share was in that

23   deal?

24   A.  I don't.  I don't.

25   Q.  Before Facebook went public, a $4,000,000 share deal would

1    have had to go through Facebook, correct?

2    A.  $4,000,000 or 4,000,000 shares?

3    Q.  Four million shares?

4    A.  That seems a reasonable assumption.

5    Q.  And people at Facebook would have to approve of such a

6    deal?

7    A.  Every deal has to be approved by Facebook.

8    Q.  Because of the conditions at the time, it being a private

9    company?

10   A.  Correct.  They had to sign off on the share transfers.

11   Q.  In your opinion, is this something most stock brokers would

12   be familiar with?

13           MR. DOLAN:  Objection.  Relevance.

14           THE COURT:  Sustained.

15   BY MS. WILLIAMS:

16   Q.  How about a two-million-share deal, would that also have to

17   go through Facebook?

18   A.  Every single share.  If you sold one share, Facebook has to

19   sign off.  The company -- forget Facebook.  Any company has to

20   sign off on that agreement.

21   Q.  As long as they are a privately held company?

22   A.  Correct.  At the end they have to sign off on it.

23   Q.  Because you would advise your clients about whether or not

24   it might be in their best financial interest to go ahead and

25   sell shares, buy stock, and so on like that, did you have any

1   idea what the value of Facebook stock was throughout 2011?

2   A.  No.  Not throughout.  I can tell you points in time when

3   something happened or there was something in the press, or

4   something salient happened that was publicly known, then I

5   would know at that point in time.

6   Q.  Do you recall any mention of a price of $27 a share during

7   2011?

8   A.  I see a number here in my report to the FBI.

9   Q.  Does that refresh your memory as to what you may have known

10  about the price per share in 2011 for Facebook stock?

11  A.  Not beyond the report.  At some point it was 27 because now

12  it is 87.  So I can guarantee it was 27 at one point in time,

13  like it was 26 and 45.

14  Q.  Do you remember telling the FBI agent that you thought that

15  $27 a share for four million shares was unrealistic?

16  A.  So it says 40 million shares.  You keep saying four

17  million.

18  Q.  I'm sorry.  That's my problem with numbers.  I'll correct

19  myself.

20      Do you remember telling the FBI agent that $27 a share for

21  40 million shares was unrealistic?

22  A.  Yes.

23  Q.  And of course, as you said before, something like that

24  would have had to come through Facebook?

25  A.  They would have to speak to the company, correct.

1    Q.  And was it possible to go ahead and put together a

2    40-million-share deal using former employees of Facebook?

3    A.  You are asking me to speculate?

4    Q.  I'm asking whether or not you know that -- or knew that at

5    the time?

6    A.  So you're asking me to speculate whether I knew and

7    suspected this could happen?

8    Q.  Yes.

9    A.  I want to make sure I understand the question.  If I were

10   to speculate --

11              MR. DOLAN:  Objection.  Calls for speculation.

12              THE COURT:  Sustained.

13              THE WITNESS:  Sorry.

14              MS. WILLIAMS:  Lay a foundation, please.

15        (Laughter.)

16   BY MS. WILLIAMS:

17   Q.  Some of the people you represented were former employees of

18   Facebook?

19   A.  Correct.

20   Q.  And you were aware of how many shares of Facebook stock

21   they owned?

22   A.  Yes.

23   Q.  Given your knowledge of your clients and the number of

24   shares of your former Facebook employee clients and the number

25   of shares that they owned, do you have an opinion about whether

1    or not it was possible in 2011 to cobble together a

2    four-million-share (sic) deal?

3    A.   So I have less than 1 percent of the clients of Facebook,

4    so this is based on that 1 percent of people.  If that scenario

5    is true, and I assume that I know 1 percent of the 100 percent,

6    the answer is I don't know.  I don't think so.  Lots of ifs

7    there.

8    Q.   Lots of ifs.

9    A.   Yeah.

10   Q.   When you emailed Mr. Ebersman, you copied Mr. Dennis in on

11   the email?

12   A.   It was an introduction, so this had to be cc'd to him.

13   Q.   And the email he gave you, I think you said, was

14   wpacquisitions@gmail.com?

15   A.   That's what it says.  Yeah.

16   Q.   Did you read anything suspicious into the fact that Ken

17   Dennis, who claimed to represent Carlos Slim, had a Gmail

18   account?

19   A.   No, not really.

20   Q.   Did you believe Mr. Dennis when he said he represented

21   Carlos Slim?

22   A.   I only take people at face value.  If they tell me to do

23   something like that, I would believe them, unless he claimed

24   something outlandish.

25             MS. WILLIAMS:  I have no further questions, Your

1   Honor.

2            THE COURT:  Any redirect?

3            MR. DOLAN:  No, Your Honor.  Thank you.

4            THE COURT:  All right.  Thank you very much.  You are

5   excused.  You have a nice day.

6            THE WITNESS:  Do I keep this?

7            THE COURT:  No.  Just leave it right there.

8            MR. DOLAN:  Actually, can we return that to counsel,

9   please.

10           THE COURT:  Yes.

11      (Document retrieved.)

12      (Excerpt concluded.)

13                        ---o0o---

14                    REPORTER'S CERTIFICATE

15                        ---o0o---

16

    STATE OF CALIFORNIA  )
17  COUNTY OF SACRAMENTO )

18

19       I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
20
             IN WITNESS WHEREOF, I subscribe this certificate at
21  Sacramento, California.

22

23    /S/_Catherine E.F. Bodene_____
             CATHERINE E.F. BODENE, CSR NO. 6926
24           Official United States District Court Reporter

25